# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Thomas Acas,
*Plaintiff*,

*v.*                                                    Civil No. 3:06cv1855 (JBA)

Connecticut Department of Correction,
*Defendant*.

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Doc. # 22]
AND PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT [Doc. # 30]**

After being demoted by the Defendant Connecticut Department of Correction (the "DOC") in 2003, Plaintiff Thomas Acas initiated this suit alleging that the DOC discriminated against him on the basis of his gender and race in violation of Title VII, 42 U.S.C. § 2000e-5. The DOC has moved for summary judgment, and for the reasons stated below, its motion will be granted. Mr. Acas has moved for leave to amend his complaint, and for the reasons stated below, his motion will be denied.

## I.      Facts and Background

Mr. Acas is a diabetic white man who began working as a correctional officer for the DOC in June 1978. In August 2000, while working at Garner Correctional Institution in Newtown, Connecticut, Mr. Acas was promoted to Lieutenant. (Acas Dep. at 9:15–11:11.) Mr. Acas was assigned to the third shift at Garner, an assignment which he claims was rendered difficult to fulfill because his medical condition disrupted his sleep and frequently caused him to be drowsy during the hours of the third shift. (*Id.* at 25:4–12.) In October of

2002 Mr. Acas twice requested a transfer to an earlier shift because of his condition, but did not do so in writing, and did not provide the DOC with a doctor's note attesting to his difficulty.  (*Id.* at 24:15–25:15.)  Although his final request for a shift change was initially granted, it was rescinded shortly thereafter, and Mr. Acas made no further shift change requests because of his diabetes after October 2002. (*Id.* at 24:4–25:15 & 26:15–18.)

By April of 2003 the DOC gave Plaintiff an unsatisfactory performance evaluation for the period March 2002 through February 2003.  (*See id.* Ex. 3 (performance evaluation noting on April 23, 2003 that Mr. Acas refused to sign it).)  Mr. Acas admits that an investigation that the DOC began in April 2003 revealed that he had used a DOC telephone to make personal calls to an "adult dating service" while on duty.  (*Id.* at 12:19–13:8.)  Following this investigation the DOC demoted Mr. Acas from Lieutenant to Correctional Counselor, effective December 2003.  (Acas Dep. at 12:20–13:11 & 33:1–9; *accord* Callahan Aff. at ¶ 3.)

On June 2, 2004, Mr. Acas filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the United States Equal Employment Opportunity Commission ("EEOC"), and received a Notice of Right to Sue from the EEOC on August 15, 2006.  He timely filed suit on October 18, 2006 in the Connecticut Superior Court, alleging that the DOC contravened Title VII when it demoted him and refused his shift change request.

In Count One, Mr. Acas alleges that the DOC discriminated against him on the basis

of his gender when it demoted him in 2003 because it failed to reprimand a female, Correctional Treatment Officer Cheryl Hicks, who also made personal phone calls using a DOC telephone while on duty. In Count Two, Mr. Acas alleges that the DOC discriminated against him on the basis of his race by refusing to accommodate his disability despite making shift changes for two minority Lieutenants with medical problems.

The DOC removed the suit to this Court on the basis of 28 U.S.C. § 1331 federal-question jurisdiction, and now moves for summary judgment.

## II.    Standards

The well-known summary judgment standard is familiar to the Court and will be applied without recitation in detail. *See, e.g.*, *Norris v. Metro-North Commuter R.R. Co.*, 522 F. Supp. 2d 402, 407–08 (D. Conn. 2007) (setting forth summary judgment standard).

A plaintiff seeking to bring a Title VII claim against his employer must first file an administrative charge with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). This filing deadline is extended to 300 days in states such as Connecticut which have agencies "with authority to grant or seek relief from such practice." *Id.*; *Lewis v. Conn. Dep't of Corr.*, 355 F. Supp. 2d 607, 615 & n.4 (D. Conn. 2005) (describing the EEOC/CHRO work-sharing agreement). Having filed his administrative charge on June 2, 2004, Mr. Acas is limited to occurrences post-dating August 7, 2003 as the basis of his Title VII claims.

Analysis of a Title VII claim proceeds under the burden-shifting framework set forth

in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). In the first step of this analysis, it is the plaintiff's burden to establish a *prima facie* case of discrimination on account of membership in a protected class. *Id.* at 802; *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)*; Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008). To establish a *prima facie* case for each Title VII claim, a plaintiff must prove: (1) membership in a protected class; (2) qualification for his position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class. *Beyer*, 524 F.3d at 163; *Holcomb*, 521 F.3d at 138; *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). Despite the "*de minimis*" nature of plaintiff's burden, "[n]onetheless, a plaintiff's case must fail if []he cannot carry this preliminary burden." *Beyer*, 524 F.3d at 163 (citations omitted).

A plaintiff alleging violations of Title VII may make use of a comparator in order to "show[] that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group," and thus establish the circumstances giving rise to an inference of discrimination. *Graham*, 230 F.3d at 39. The comparator to whom the plaintiff points must be "'similarly situated in all material respects' to the individual with whom [he] seeks to compare [him]self." *Id.* (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)). The plaintiff "need not be identical to that of another for the two to be similarly situated." *Graham*, 230 F.3d at 40. Rather, whether the plaintiff and comparator are "similarly situated in all material respects"

is a question that

> must be judged based on (1) whether the plaintiff and those he maintains
> were similarly situated were subject to the same workplace standards and (2)
> whether the conduct for which the employer imposed discipline was of
> comparable seriousness. In other words, there should be an 'objectively
> identifiable basis for comparability.'

*Id.* (citations omitted). Thus, instead of requiring the plaintiff's and comparator's positions to be exactly the same, the Court must find "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Id.* (rather than requiring the comparator to be exactly identical to the plaintiff, "the Supreme Court used the phrase 'comparable seriousness' to identify conduct that might help to support an inference of discrimination) (quoting *McDonnell Douglas*, 411 U.S. at 804). While the question of whether two individuals are sufficiently similar for one to be the other's comparator is "ordinarily" a factual question, *Graham*, 230 F.3d at 39, in some cases "the issue can be resolved as a matter of law" at the summary judgment stage, *see, e.g.*, *Woods v. Newburgh Enlarged City Sch. Dist.*, No. 07-0610-cv, 2008 U.S. App. LEXIS 17568, *6, 2008 WL 3841497, *2 (2d Cir. 2008) (finding, as a matter of law, that two individuals did "not bear a sufficient resemblance . . . to permit an inference of discrimination" under the comparator standard articulated in *Graham*).

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "produce evidence" that it took the adverse employment action "'for a legitimate, nondiscriminatory reason.'" *Holcomb*, 521 F.3d at 140 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (U.S. 1981)). The defendant's burden is satisfied if its proffered

evidence, "'*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Holcomb*, 521 F.3d at 141 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) (emphasis in *Hicks*)).

After the defendant satisfies this intermediate burden, the plaintiff "'must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination.'" *Cooper v. Conn. Pub. Defenders Office*, 2008 U.S. App. LEXIS 11373, *5, 2008 WL 2228624, *2 (2d Cir. 2008) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000)). Plaintiff's burden at this stage is not *de minimis*. Instead, as the Second Circuit has explained, once the employer satisfies its burden by

> articulat[ing] a nondiscriminatory reason for its actions, the presumption [of unlawful discrimination created by the plaintiff's *prima facie* case] completely drops out of the picture. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [against the plaintiff] remains at all times with the plaintiff. Thus, once the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.

*Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (quoting *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000)) (third alteration in *Joseph*); *see also Hicks*, 509 U.S. at 510–11 ("The presumption [of unlawful discrimination created by the plaintiff's *prima facie* case], having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture."). Therefore, the plaintiff "'must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action].'" *Cooper*, 2008

U.S. App. LEXIS 11373 at *5–*6, 2008 WL 2228624 at *2 (quoting *Weinstock*, 224 F.3d at 42) (alterations in *Cooper*).

**III.    Discussion**

*A.      Count One: Gender Discrimination*

Mr. Acas claims that DOC discriminated against him on the basis of his gender when it demoted him from Lieutenant to Correctional Counselor in December 2003.  To establish "circumstances giving rise to an inference of discrimination on the basis of his" gender, Mr. Acas points to a woman, Cheryl Hicks, who, he asserts, also made personal use of the Garner facility phone but did not suffer demotion.

On the record before this Court, and drawing all reasonable inferences in the light most favorable to Mr. Acas, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), Plaintiff has failed to produce enough evidence for a reasonable factfinder to find Ms. Hicks sufficiently "similarly situated in all material respects" such that her lack of discipline could support an inference of gender discrimination.  Mr. Acas and Ms. Hicks were not "subject to the same workplace standards" at the DOC because as a Lieutenant, Mr. Acas, unlike Ms. Hicks, was held to DOC standards for management.  As well, Mr. Acas and Ms. Hicks reported to different level supervisors and were given different performance evaluations.  Ms. Hicks's conduct was not of "comparable seriousness" to that of Mr. Acas, both because the nature of their phone usage was different, and because Mr. Acas's position as Lieutenant at the time he used DOC phones while on duty to call a dating service led the DOC to consider Mr. Acas's conduct especially serious.  (*See, e.g.*, Acas Dep. Ex. 2 at 2

("Your actions . . . indicate that you should not be a lieutenant at this time" in light of supervisors' role "as role models for their peers and subordinates") (quoting Letter from Garner Correctional Institution Warden Giovanny Gomez to Mr. Acas (Nov. 20, 2003)).) Finally, the DOC had investigated and documented Mr. Acas's phone misuse at a time when Plaintiff's job performance was "unsatisfactory." The differences between the levels of Mr. Acas's and Ms. Hicks's positions are sufficiently great that, once contextualized, the bare fact that they both made personal phone calls on DOC telephones does not constitute "a reasonably close resemblance of the facts and circumstances" of their cases.

The DOC subjected Ms. Hicks and Mr. Acas to different workplace standards related to their respective ranks. Mr. Acas was a Lieutenant at the time of the evaluation and at the time he made his personal phone calls. By contrast, at the time she made personal phone calls, Ms. Hicks was a Correctional Treatment Officer (Acas Dep. at 18:8–12) which, according to uncontested evidence,[1] is not a supervisory position. (Callahan Aff. at ¶ 4 & Att. B; Def.'s Local R. 56(a)1 Stmt. ¶ 11 & Pl.'s Local R. 56(a)2 Stmt. ¶ 11 (admitting that "[t]he position of Correctional Treatment Officer is not a supervisory position and Ms.

---

[1] The Court is permitted to rely on evidence proffered by the DOC in ruling on the its motion for summary judgment to the extent that that evidence is uncontradicted by Mr. Acas. *Cf., e.g.*, *Hawkins v. Wegmans Food Market, Inc.*, 224 F. App'x 104, 105–06 (2d Cir. 2007) (affirming district court's grant of summary judgment to defendant based on "uncontradicted summary judgment evidence" proffered by defendant); *Miner v. Clinton County*, --- F.3d ----, 2008 U.S. App. LEXIS 18925, *20 n.6, 2008 WL 4093705, *6 n.6 (2d Cir. 2008) (affirming grant of summary judgment to defendant, and "find[ing] no error in the District Court's reliance on" evidence proffered by defendant where evidence proffered by plaintiff "does not contradict" defendant's evidence).

Hicks was not a supervisor").) Mr. Acas, unlike Ms. Hicks, served the DOC in a supervisory

capacity, and the DOC evaluated his job performance against supervisor-specific metrics.

The June 2003 performance evaluation, pursuant to which Mr. Acas's job performance was

deemed unsatisfactory, was designed specifically for DOC supervisors. Indeed, it is entitled

"Supervisors Performance Evaluation," and it evaluates employees for their performance of

supervisor-specific skills and responsibilities, including whether the employee "effectively

tasks subordinates and clearly delineates standards expected." (Acas Dep. Ex. 3 at 1, 2.) The

time period for the DOC's evaluation of Mr. Acas predated his phone misuse, and concluded

for other reasons that he "ha[d] allowed himself to become a poor role model" and had failed

to "portray[] leadership and responsibility." (Acas Dep. Ex. 3 at 3–4.)[2] The record contains

no evidentiary basis on which to conclude that the DOC similarly was concerned with Ms.

Hicks's "leadership and responsibility," i.e., Mr. Acas and Ms. Hicks were not "subject to the

same workplace standards" at the DOC.[3]

Moreover, uncontradicted evidence establishes that Mr. Acas, as a Lieutenant,

assisted DOC "Captain[s] in supervising an assigned shift" and "work[ed] under the general

_____

[2] For example, the evaluation found that Mr. Acas was "not well groomed," was "inconsistent and at times irresponsible," was not good at "[c]ommunication and cooperation," and "ha[d] not shown initiative or organization." (Acas Dep. Ex. 3 at 1–3.)

[3] While the DOC's policy prohibiting personal phone calls applied to all DOC employees (*see* Dep't of Corr. Admin. Directive 2.17 at ¶¶ 5.A.3–4 (available at http://www.ct.gov/doc/LIB/doc/PDF/AD/ad0217.pdf) (May 10, 2002); Dep't of Corr. Post Order 6.2.1 (quoted in Acas Dep. Ex. 2 at 4)), the "workplace standards" to which Mr. Acas was subject, and pursuant to which he was evaluated, were supervisor-specific and thus inapplicable to Ms. Hicks.

direction of an officer of higher rank." (Callahan Aff. Att. A at 1.) By contrast, Ms. Hicks, a Correctional Treatment Officer, "works under the close supervision of a custody or treatment staff member of higher rank" but also "may work more independently with acquired experience." (*Id.* Att. B at 1.) Specifically, the evidence indicates that Ms. Hicks, unlike Mr. Acas, reported to a Correctional Counselor. In fact, Mr. Acas became Ms. Hicks's direct supervisor when he was demoted. (Acas Dep. at 17:15–18, 18:4–7.) These differences between Plaintiff's and Mr. Acas's positions were greater than the differences between a plaintiff and another individual which the Second Circuit has found to make the individual an inappropriate comparator. *See Shumway*, 118 F.3d at 64 (granting summary judgment to employer on Title VII sex discrimination claim because plaintiff and comparators were not supervised by same individual supervisors, even though they were of same rank).

Mr. Acas and Ms. Hicks also did not engage in "comparably serious" conduct. Mr. Acas acknowledges that the personal phone calls he made were to an "adult dating service." (Acas Dep. at 13:4.) In contrast, Mr. Acas testified that Ms. Hicks "used to call all over the state," "called her son" and "called companies trying to buy stuff on those 1-800 numbers." (*Id.* at 19:3–8.)[4] This difference between the nature and purpose of the calls is accentuated

---

[4] Mr. Acas also testified in his deposition that Ms. Hicks told him that a supervisor, Thomas Hunt, had "approached her with the facility phone bill and went through it with her and pointed out all of the phone calls she made, and stat[ed] she might be disciplined for it." (Acas Dep. at 18:15–21.) However, at oral argument, Mr. Acas, through counsel, conceded that this testimony by Mr. Acas would be inadmissable hearsay. Because this Court considers only evidence shown to be admissible in ruling on a motion for summary judgment, it disregards this portion of Mr. Acas's testimony. *See*

given the DOC's concern about Plaintiff at that time that he "ha[d] not displayed the ability to apply sound practices/decisions" and was not a good "role model." (Acas Dep. Ex. 3 at 2, 4.) In making calls to an "adult dating service" while an on-duty manager Mr. Acas, unlike Ms. Hicks, both violated DOC policies barring personal phone use, and simultaneously aggravated existing issues about his ability to perform his supervisor-specific leadership job duties and be a good role model.

At the time it demoted Mr. Acas the DOC had a documented record of his telephone misuse and his unsatisfactory job performance, further underscoring the dissimilarity between Mr. Acas and Ms. Hicks. In 2003, Mr. Acas "was found to have made numerous personal phone calls to an adult dating service while on duty," in response to which the DOC engaged in "an investigation and [held] a pre-disciplinary hearing." (Callahan Dep. at ¶ 5; *accord* Acas Dep. at 12:19–13:8.) In addition to records of this investigation and hearing, Mr. Acas's personnel file also contained the unsatisfactory performance evaluation discussed above. (Callahan Dep. at ¶ 5.) By contrast, the DOC's files contain "no complaints, incident reports or other documents on file substantiating" Ms. Hicks's alleged personal phone calls; in addition, the DOC's personnel file on Ms. Hicks "does not contain an unsatisfactory performance evaluation." (*Id.* at ¶ 7.) The documentation and hearing results as well as his current unsatisfactory job performance "played a role in the [DOC]'s decision to demote

---

*Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) ("this Circuit has explained that it is appropriate for the district court . . . to rely only on admissible evidence in ruling on summary judgment").

him" (*id.* at ¶ 5),[5] demonstrating undisputed "material" differences between Mr. Acas and Ms. Hicks.

Affiant Joseph Rollo, a Correctional Counselor, states that Correctional Counselor Supervisor Ms. Stacey Mamora "made outside phone calls continuously and [was] not disciplined" (Rollo Aff. at ¶ 7), though he does not specify when or to whom Ms. Mamora made these calls.[6] The same material differences between Mr. Acas and Ms. Hicks also serve

---

[5] While Mr. Acas proffers the affidavit of Lieutenant George Wall, who claims to have known that Ms. Hicks (along with others) "made many phone calls" (Wall Aff. at ¶ 11), the Court will not consider Mr. Wall's affidavit, *infra* Part III.B.2, which, in any event, does not establish that Mr. Wall's knowledge should be imputed to the DOC.

In the context of sexual harassment claims brought under Title VII, "[t]he question of when an official's actual or constructive knowledge will be imputed to the employer is determined by agency principles," including considerations such as the official's position in the employer's management hierarchy and whether the employer charged the official with the duty either to stop the conduct or inform the company of it. *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63–64 (2d Cir. 1998) (quoting *Torres v. Pisano*, 116 F.3d 625, 636–37 (2d Cir. 1997)).

Plaintiff offers no evidence regarding whether the DOC charges lieutenants with specific duties to act or inform. While the Administrative Directive imposes on all DOC staff the responsibility to "report to a supervisor or appropriate personnel any policy violation or breach of professional conduct involving the public, staff or inmates under the jurisdiction of the Department of Correction" (Conn. Dep't of Corr. Admin. Directive 2.17 at ¶ 7), its applicability to Ms. Hicks' alleged personal telephone calls is not obvious. This uncertainty does not, however, create a genuine issue of material fact because, for the reasons stated above, this Court would grant summary judgment even if Mr. Wall's and Mr. Acas's knowledge of Ms. Hicks's phone calls could be imputed to the DOC.

[6] Although Mr. Acas has not offered Ms. Mamora as a comparator, the Court nevertheless considers and rejects the possibility that she could serve as one. While "[t]he court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the court's attention," *Healthfirst, Inc. v. Medco Health Solutions, Inc.*, No. 03 CV 5164, 2006 U.S. Dist. LEXIS 90785, *17, 2006 WL 3711567, *5 (S.D.N.Y. 2006), the better practice is to review the

to disqualify Ms. Mamora as a comparator for Mr. Acas. Ms. Mamora was not a position comparable to Plaintiff's in the DOC's hierarchy at the time Mr. Acas was demoted.[7] There is also no evidence that the DOC was dissatisfied in any way with Ms. Mamora's job performance, nor that the DOC conducted an investigation into, or otherwise substantiated, allegations that Ms. Mamora improperly used the phone.[8] (*See* Fasano-Fernicola Aff. at ¶ 2 ("There have been no reports, investigations, incident reports or other documentation" regarding improper telephone usage by Ms. Mamora).) Ms. Mamora is thus not a comparator for Mr. Acas.

----

record thoroughly before determining whether to grant summary judgment. *Cf. Woods v. Enlarged City School Dist. of Newburgh*, 473 F. Supp. 2d 498, 504 n.3 (S.D.N.Y. 2007) (court "conducted a thorough review of the record" despite failure by party opposing summary judgment to "submit a sufficiently detailed statement of facts"), *aff'd Woods v. Enlarged City School Dist. of Newburgh*, 2008 U.S. App. LEXIS 17568 at *2, 2008 WL 3841497 at *1 (2d Cir. 2008) (affirming district court's "summary judgment opinion [which] reviews and analyzes the evidence with characteristic thoroughness"). This is especially true in employment discrimination cases, where "careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." *Graham*, 230 F.3d at 38.

[7] While evidence proffered by the DOC does not foreclose the possibility that Correctional Counselor Supervisors—a position to which Ms. Mamora was promoted in October 2003 (Fasano-Fernicola Aff. at ¶ 2)—and Lieutenants were subject to the "same workplace standards," Mr. Acas has proffered no evidence from which such an inference could be made.

[8] It is unclear whether Mr. Rollo's knowledge could be imputed to the DOC; the record is silent regarding where in the DOC's hierarchy he falls, and regarding the applicability of Administrative Directive 2.17 to these circumstances. Because the parties have not proffered any evidence on this issue, the Court cannot conclude whether the "agency principles" governing imputed knowledge make the DOC responsible for Mr. Rollo's knowledge. *See generally supra* note 5.

Because Mr. Acas has not demonstrated that there is any "reasonably close resemblance of the facts and circumstances" between Mr. Acas and either Ms. Hicks or Ms. Mamora, he has not "show[n] that the [DOC] subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." Having thus failed to establish circumstances giving rise to an inference of discrimination, Mr. Acas has not made out a *prima facie* case of gender discrimination.

Moreover, even if the Court were to assume, *arguendo*, that Mr. Acas made out a *prima facie* case of discriminatory treatment by the mere fact that two female employees were not disciplined for telephone misuse, he has failed to rebut the DOC's articulation of "a legitimate, nondiscriminatory reason" for his demotion. The DOC explains that it demoted Mr. Acas for two reasons: first, it found, after investigation of the phone misuse allegations and a hearing, that Mr. Acas violated Administrative Directive 2.17, which requires employees to "[e]nsure that a safe, secure and sanitary work environment is maintained" and to "[r]emain alert, aware of, and responsive to the surroundings at all times." (Callahan Aff. at ¶ 5; Conn. Dep't of Corr. Admin. Directive 2.17 at ¶¶ 5.A.3–4.) Second, it deemed Mr. Acas's job performance unsatisfactory for the reasons set out in the April 2003 evaluation in his personnel file. (Callahan Aff. at ¶ 5.) The Garner Warden who demoted Mr. Acas explained that a combination of his phone calls, unsatisfactory work, and working time he spent "reading a newspaper in the Captain's office" instead of performing work, "indicate[s] that [Mr. Acas] should not be a lieutenant at this time." (Acas Dep. Ex.

2 at 2 (quoting Letter from Garner Correctional Institution Warden Giovanny Gomez to Mr. Acas (Nov. 20, 2003)).)

Having articulated nondiscriminatory reasons why it demoted Mr. Acas, and proffered evidence in support thereof, the DOC has satisfied its burden under the *McDonnell Douglas* burden-shifting framework, and Mr. Acas must "come forward with evidence that [the DOC's] proffered, non-discriminatory reason is a mere pretext for actual discrimination." Mr. Acas must present "sufficient evidence" to support a conclusion that his demotion was, "more likely than not," due to the DOC's discrimination. *Cooper*, 2008 U.S. App LEXIS 11373 at *5, 2008 WL 2228624 at *2. Rather than "sufficient evidence," however, Mr. Acas proffers *no* evidence suggesting that the DOC's rationales for demoting him are pretextual. In his opposition to summary judgment Mr. Acas asserts that the DOC's unsatisfactory evaluation of him could not have been the exclusive basis for his demotion because the demotion occurred "six months after the unsatisfactory evaluation." (Pl.'s Mem. Supp. Mot. Opp'ing Summ. J. at 5.) Mr. Acas concedes, however, that the unsatisfactory performance evaluation played some part in his demotion (*id.*), and he produces no evidence that would support the inference that the six-month delay demonstrates, or was due to, the DOC's gender bias. The affidavits relied on by Mr. Acas establish, at most, that the DOC inconsistently enforced its phone policy,[9] which is insufficient to support an inference that

---

[9] Three of the affidavits proffered by Mr. Acas in support of his opposition to summary judgment actually aver that the DOC penalized only Mr. Acas for his phone usage, and declined to penalize both men and women for personal phone usage. The

gender bias or discrimination motivated that inconsistency.

Mr. Acas having failed to offer evidence from which reasonable jurors could conclude that the DOC's stated nondiscriminatory reasons for his demotion were merely a pretext for gender discrimination, summary judgment must be granted on Count One.

B.     *Count Two: Race Discrimination*

The DOC argues that Mr. Acas is time-barred from using his requests for medical accommodation as the basis for Count Two because he made the requests more than 300 days prior to June 2, 2004, when he filed a complaint with the CHRO/EEOC. In opposition, Mr. Acas claims that he made repeated requests for accommodation, including during the period covered by his CHRO/EEOC filing. In support, he offers his own and three witnesses's affidavits which, he claims, demonstrate a genuine issue as to the material fact of the existence of timely requests.

During the discovery in this case, in his responses to the DOC's interrogatories, Mr. Acas stated that his requests for accommodation were made on two occasions in verbal form

---

affiant Robert Gibbs states "[t]hat he was aware of other people of all ranks and job specifications . . . that were abusing the phone system that were never disciplined." (Gibbs Aff. at ¶ 13.) Mr. Stack and Mr. Wall each state that men and women in various positions—Captain Edwin Myers, Correctional Supervisor Thomas Hunt, and Ms. Hicks—used the phone for personal calls but were not disciplined. (Stack Aff. at ¶ 12; Wall Aff. at ¶ 11.) Only one affiant, the retired correctional counselor Mr. Rollo, identifies only females as having escaped retribution for their personal phone usage. (Rollo Aff. at ¶ 7.) However, his affidavit merely restates the names of Ms. Hicks and Ms. Mamora, who have been rejected as comparators for Mr. Acas. If these facts suggest anything, they suggest a gender-neutral haphazardness in the DOC's enforcement of its policy.

"prior to October 2002." (Pl.'s Resp. to Def.'s Interrog. No. 6.) He confirmed this

chronology of events in his deposition on November 5, 2007:

> Q: Okay. Now, on page three of your responses [to interrogatories], at the
> top you say: I made two verbal requests prior to October 2002 to Major
> Foley . . . These requests were made to help control [your] diabetes, is
> that correct?
> A: That's correct.
> . . . .
> Q: Now, after October 2002, did you ever request to be moved again
> because of your diabetes?
> A: No, because I just thought that it wouldn't be granted.

(Acas Dep. at 24:5–26:18.)

To oppose the DOC's motion for summary judgment Mr. Acas now offers his own

affidavit, which he says shows that he "continually asked for a transfer to second shift, due

to his uncontrolled diabetes" (Pl.'s Mem. in Supp. Opp'n to Summ. J. at 7), and offers as well

the affidavits of Mr. Stack, Mr. Gibbs and Mr. Wall.

### 1. Mr. Acas's Affidavit

Mr. Acas's own affidavit will not be permitted to oppose summary judgment because

it directly contradicts his prior sworn deposition and interrogatory responses which clearly

state that he made no accommodation requests to the DOC after October 2002. In his

affidavit Mr. Acas states that "[p]eriodically, [he] renewed [his] request for a transfer,

through October, 2003." (Acas Aff. at ¶ 9.) The only reading of his affidavit which would

not be contradictory is if his transfer requests after October 2002 were not made because of

his diabetes. It is well-settled in this Circuit that "a party may not create an issue of fact by

submitting an affidavit in opposition to a summary judgment motion that, by omission or

addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City*

17

*Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). Although *pro se* parties may be accorded some leeway to supplement the post-discovery record with affidavits, *see id.* at 620, Mr. Acas was represented by counsel who was present during his deposition. Indeed, Mr. Acas's counsel cross-examined him about when or to whom Mr. Acas made his requests, to which Mr. Acas's only response was that he made his requests to Major Foley, who did not ask Mr. Acas for documentation of his diabetes. (*See* Acas Dep. at 42:22–43:5.) Furthermore, on redirect, counsel for the DOC confirmed with Mr. Acas that all of his requests occurred prior to October 2002:

> Q:    I just want to be clear. And you made that request [to Major Foley for accommodation for diabetes] prior to October of 2002, correct?
> A:    That's correct.
> Q:    And you never made another request after that?
> A:    I had asked him twice within a period of about a week.
> Q:    Prior to October?
> A:    Yeah, just prior to October.

(*Id.* at 43:8–16.) Immediately thereafter the deposition concluded. (*Id.* 43:18.)

Where Mr. Acas's affidavit directly contradicts his sworn deposition testimony and he provides no explanation for the inconsistency between his affidavit and deposition testimony, the Court excludes consideration of Mr. Acas's affidavit, prepared solely to oppose the DOC's motion for summary judgment on Mr. Acas's race discrimination claim (*See* Pl.'s Mot. Leave to Amend Compl. at 2 (noting that affidavits of Mr. Acas as well as Messrs. Stack, Gibbs and Wall "refute[] Defendant's claim that the Second Count should be dismissed because it is time-barred")), which the DOC predicated on Mr. Acas's prior sworn discovery statements regarding the timing of his requests for accommodation for his diabetes. Mr. Acas's efforts to create an issue of fact regarding the timing of his requests by contradicting his own deposition testimony, will not be permitted.

*Affidavits of Messrs. Stack, Gibbs and Wall*

The DOC argues that Mr. Acas should also be barred from relying on the affidavits of Messrs. Stack, Gibbs and Wall because Plaintiff did not disclose these affidavits until the day he filed his opposition to the DOC's motion for summary judgment. (*See* Def.'s Reply to Pl.'s Opp'n to Summ. J. at 3–4, 6, 8–9.)[10]  The DOC asserts that this delay violates Federal Rule of Civil Procedure 26(e)(1)(A), which imposes a duty on each litigant "who has responded to an interrogatory" to "supplement or correct its disclosure or response[] in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect," and that Mr. Acas should be sanctioned under Federal Rule of Civil Procedure 37(c)(1), which authorizes the Court to exclude unamended or untimely amended responses from use "to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."  Mr. Acas does not make any argument in response.

The record shows that in response to a DOC interrogatory requesting Mr. Acas to "[i]dentify each person whom you expect to call as a witness," Mr. Acas provided a list of witnesses that included Messrs. Gibbs and Stack, but not Mr. Wall. (*See* Pl.'s Answer to Def.'s Interrog. 14.)   Using Mr. Wall's affidavit in opposing summary judgment demonstrates that this discovery response was "incomplete or incorrect" as it omitted his

_____

[10] The DOC also argues that "it is inappropriate to raise new claims for the first time in documents submitted in opposition to summary judgment." (Def.'s Mem. in Supp. Summ. J. at 6.)  In this case, however, Mr. Acas offers the affidavits of Messrs. Stack, Gibbs and Wall to bolster his claim—stated clearly in his original complaint—that the DOC discriminated against him on the basis of race by declining to accommodate his diabetes.  In introducing these affidavits, then, Mr. Acas does not seek to introduce a new claim, but rather to support his argument that his existing race discrimination claim is timely.  The rule asserted by the DOC to bar Mr. Acas from using the three affidavits therefore has no application here.

name entirely. In his response to a DOC interrogatory asking Mr. Acas to "state in what form, i.e. orally, in writing, etc. you requested a reasonable accommodation for your diabetes as alleged in Paragraph 13 of the Complaint, and identify how and who denied said request as alleged," Mr. Acas listed only requests that he made "[o]rally to Major Foley." (*Id.* at Interrog. 5.) And in response to a DOC interrogatory asking him to "identify each and every request for reasonable accommodation you have made to defendant, i.e., when, to whom, for what condition, in what form, i.e., oral, written, defendant's response, etc.," Mr. Acas stated in full: "I made 2 verbal requests prior to October 2002 to Major Foley. He stated that he would see if it was possible to effect a transfer. These requests were made to help control my diabetes." (*Id.* at Interrog. 6.) Thus, with the affidavits of Messrs. Gibbs, Stack and Wall, which he proffers as evidence that he made requests for reasonable accommodations postdating August 7, 2003, his discovery responses became "incomplete or incorrect" with no supplementation prior to filing his opposition to the DOC's motion for summary judgment.

As a preliminary matter, "Rule 37(c)(1)'s precautionary sanction is 'automatic' absent a determination of either 'substantial justification' or 'harmlessness.'" *Am. Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002), *aff'd Mopex, Inc. v. Am. Stock Exch., Inc.*, No. 02-7477, 2003 U.S. App. LEXIS 1370, *2 (2d Cir. 2003) (summarily affirming "substantially for the reasons stated by the Court"). Nonetheless, "[d]espite the 'self-executing' nature of Rule 37(c)(1), the imposition of sanctions under the rule is a matter within the trial court's discretion." *Am. Stock Exch.*, 215 F.R.D. at 93; *see also Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006) (noting district courts' "wide discretion to impose sanctions, including severe sanctions, under Federal Rule of Civil

Procedure 37"), *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (reviewing imposition of sanctions under Federal Rule 37(c) "for abuse of discretion"). In determining whether to impose sanctions under Federal Rule 37, the Court should consider "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Patterson*, 440 F.3d at 117 (quotations and brackets omitted).

Counsel for Mr. Acas makes no attempt to justify his failure to supplement discovery or otherwise earlier disclose the subject matter of these affidavits, which he submitted almost three months after the conclusion of discovery, and which he provided to the DOC and filed with the Court only as attachments to Plaintiff's opposition to summary judgment.[11] The affidavits directly contradict Mr. Acas's sworn deposition testimony as well as his responses to the DOC's interrogatories. Federal Rule 26(e)(1)(A) required Plaintiff to supplement his discovery responses when he "learn[ed] that in some material respect the disclosure or response [wa]s incomplete or incorrect," or else to confirm that "the additional or corrective

---

[11] Counsel for Mr. Acas was clearly aware well before opposing summary judgment that these affidavits would contain information rebutting the DOC's argument that Mr. Acas's race discrimination claim was time-barred. Counsel for Mr. Acas knew prior to the 2007–08 winter holidays that he would offer affidavits concerning the timeliness of his requests for reasonable accommodation, since his ground for seeking an extension of time in which to oppose summary judgment explained that "[w]itnesses were unavailable during the normal response time due to the Holidays," and that "[w]ithout [their] supporting affidavits, Plaintiff will not be able to sustain his burden at Summary Judgment." (Pl.'s Mot. Recons. of Order Den. Pl.'s Mot. For Ext. Time at 2.) Despite presumably knowing the gist of what the affidavits would state well before offering the finalized signed versions in support of his opposition to summary judgment, he did not supplement or correct his clearly incomplete answers to the DOC's interrogatories.

information ha[d] . . . otherwise been made known to the [DOC] during the discovery process or in writing." This failure alone could justify excluding these affidavits. *See Haas v. Del. & Hudson Ry. Co.*, 2008 U.S. App. LEXIS 13417, *6–*8, 2008 WL 2566699, *2–*3 (2d Cir. 2008) (affirming exclusion of plaintiff's witness's affidavit where "[p]laintiff's counsel does not explain why he failed to identify" the witness, despite only prejudice to defendant being that defendant had already filed its motion for summary judgment, and despite fact that "continuance would have mitigated somewhat the prejudice to" defendant).

Furthermore, the form of these affidavits is concerning. The affiants generally state that "to the best of [their] knowledge," Mr. Acas made requests for transfer "often" and "until the day he was demoted," but provide no basis for their personal knowledge. However, where each affiant stated that they actually "knew" that Mr. Acas requested transfer because of his diabetes or medical condition, each affiant specified a period substantially before the cutoff date of August 7, 2003. Mr. Stack and Mr. Wall each state that they "knew" that Mr. Acas requested a transfer in "November 2002." (Stack Aff. at ¶ 7; Wall Aff. at ¶ 7.) Mr. Gibbs specifies only that he "knew" of requests by Mr. Acas "in the Fall of 2002." (Gibbs Aff. at ¶ 7.) The fact that the affidavits were belatedly submitted without explanation and were submitted only in response to the DOC's motion for summary judgment, coupled with the fact that what purports to contradict Mr. Acas's discovery statements are generalities on top of these more specific statements, gives the distinct appearance that they were submitted to produce a sham issue of fact in order to survive summary judgment. *Cf. Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43–44 (2d Cir. 2000) (noting that affidavits from affiants other than deponents *generally* alleviate "the concern that the proffered issue of fact is a mere 'sham,'" but justifying this view on assumption that

"'new evidence may furnish a good faith basis for the inconsistency'") (citing and quoting *Delaney v. Deere & Co.*, 219 F.3d 1195, 1196 n.1 (10th Cir. 2000)).

The importance of the affiants' statements to Mr. Acas's argument that his race discrimination claim is timely underscores the prejudice to DOC if the affidavits were to be considered. The evidence the DOC gathered over the eight months of discovery developed its defense that Mr. Acas's race discrimination claim was time-barred and one basis of its motion for summary judgment. The DOC asked Mr. Acas three times whether he made any requests for transfer after October 2002, and Mr. Acas said no each time. Given Mr. Acas's consistent sworn deposition testimony and written responses to its interrogatories on this timing issue, there was no need for the DOC to gather additional evidence regarding the timing of his requests, and thus the DOC had no means of responding to the substance of the contrary affidavits, demonstrating that Plaintiff's delay was not harmless. *See Haas*, 2008 U.S. App. LEXIS 13417 at *7, 2008 WL 2566699 at *3 (finding prejudice to defendant by plaintiff's failure to identify witness during discovery even though only prejudice was "caused by waiting until after the close of discovery and, moreover, after [the defendant] had prepared and filed its motion for summary judgment"); *see also Cunningham v. Consol. Edison*, 2006 U.S. Dist. LEXIS 22482, *41, 2006 WL 842914, *15 (E.D.N.Y. 2006) ("A party's failure to disclose is harmful even where it prevents the other side from attempting to acquire evidence which *might* contradict the undisclosed testimony.") (emphasis in original).

Even though Plaintiff has not requested a continuance for further discovery, this is neither an appropriate nor effective remedy to the DOC's prejudice. The DOC complied with the deadlines set forth in this Court's Scheduling Orders when it moved for summary judgment on December 17, 2007. Mr. Acas moved for an extension of time to oppose this

motion, explaining that the witnesses necessary for Mr. Acas to survive summary judgment—the affiants whose affidavits the Court now excludes—were not available during the winter holidays (Pl.'s Mot. Recons. of Order Den. Pl.'s Mot. For Ext. Time at 2), which, with the DOC's consent, was sufficient grounds for this Court to grant Mr. Acas's motion. These grounds do not excuse or justify Plaintiff's failure to make any effort to supplement his discovery during the period of the extension.

While "the remedy of preclusion should be used sparingly," *Bastys v. Rothschild*, 154 Fed. App'x 260, 262 (2d Cir. 2005), the Court concludes that it is justified here. *See Izzo v. ING Life Ins. & Annuity Co.*, 235 F.R.D. 177, 185 (E.D.N.Y. 2005) ("[d]isciplinary sanctions under Rule 37 are intended," in part, to "'ensure that a party will not benefit from its own failure to comply'" with discovery obligations) (quoting *Update Art, Inc. v. Modiin Publishing, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988)); *see also Bastys*, 154 Fed. App'x at 263 (affirming district court's exclusion of plaintiff's expert witness submissions where plaintiff failed to comply with specified discovery conclusion date, where plaintiff failed to identify justify such failure, and where defendant would be prejudiced by admission). The Court therefore excludes these affidavits.

On the evidence remaining before the Court after exclusion of the affidavits of Messrs. Stack, Gibbs and Wall, there is no possibility that reasonable jurors could conclude that Mr. Acas made any requests for a transfer on the basis of his diabetes on or after August 7, 2003. There is, in fact, no evidence whatsoever attesting to any post-2002 requests by Mr. Acas. Therefore, Mr. Acas's race discrimination claim is time-barred, and summary judgment must be granted to the DOC.

3.    *Issues of Fact Raised by Affidavits of Messrs. Stack, Gibbs and Wall*

Even assuming, *arguendo*, that the affidavits should be considered, they do not create a genuine issue of material fact with respect to the timing of Mr. Acas's requests for transfer for reasonable accommodation of his diabetes or medical condition. The affidavits of Messrs. Stack and Gibbs identify requests for transfer that Mr. Acas based on his diabetes as occurring in the last part of 2002. Mr. Gibbs states "[t]hat he knew Thomas Acas requested to be transferred in the Fall of 2002 for health reasons." (Gibbs Aff. at ¶ 7.) Mr. Stack, in a similar statement, pinpoints Mr. Acas's diabetes-based requests as taking place "in November 2002." (Stack Aff. at ¶ 7.) The verbatim language in each affidavit "[t]hat to the best of his knowledge, Thomas Acas requested the transfer often and also requested to go to second shift until the day he was demoted" (Gibbs Aff. at ¶ 9; Stack Aff. at ¶ 10) never associates these transfer requests with Mr. Acas's medical needs. The affidavits thus do nothing to unsettle the Court's conclusion that there is no evidence attesting to any post-2002 requests Mr. Acas made on the basis of his medical condition. Therefore, Mr. Acas's race discrimination claim is time-barred, and summary judgment must be granted in favor of the DOC.

### 4.  *Mr. Acas's* Prima Facie *Case of Racial Discrimination*

Even assuming, *arguendo*, that Mr. Acas's claim is not time-barred, summary judgment should nevertheless be granted if the evidence, with all reasonable inferences drawn in the light most favorable to Mr. Acas, does not establish any reasonable possibility that he will prevail on his claim. In his race discrimination claim, Mr. Acas alleges that the DOC failed to accommodate his medical condition while accommodating those of two non-white employees. Thus, Mr. Acas again seeks to use comparators to demonstrate circumstances giving rise to an inference of the DOC's discrimination on the basis of race.

Mr. Acas alleges that the DOC responded to Lieutenant Denise Butler, an African-American woman, and Lieutenant James Hernandez, a Hispanic man, by transferring them to accommodate their medical conditions. (Compl. at ¶ 17; Acas Dep. at 26:19–23 & 28:15–22.)

Mr. Acas does not present any evidence regarding either Ms. Butler or Mr. Hernandez aside from his own deposition testimony and the affidavits of Messrs. Stack and Wall which state "[t]hat through his knowledge and belief, Denise Butler was accommodated with a transfer due to narcolepsy." (Stack Aff. at ¶ 14; Wall Aff. at ¶ 12.) As to Mr. Hernandez, Mr. Stack asserts "[t]hat through his knowledge and belief, Jimmy Hernandez was accommodated and transferred from Corrections to Community Service, due to medical conditions." (Stack Aff. at ¶ 15.) In a similar statement, Mr. Wall states that "[t]hat through his knowledge and belief, Jimmy Hernandez was accommodated and transferred from Corrections to Community Service, due to a heart condition." (Wall Aff. at ¶ 13).

These affidavits do not state that either Ms. Butler or Mr. Hernandez was a Lieutenant, and thus the same rank as Mr. Acas. They do not state that the "transfer" with which the DOC "accommodated" Ms. Butler's "narcolepsy" was a transfer of the type Mr. Acas requested, i.e., to a different shift at the same institution. They both state that Mr. Hernandez received a transfer to a wholly different facility—he was transferred out of Corrections and into Community Service—which is not what Mr. Acas requested. They do not state how, when, or to whom Ms. Butler or Mr. Hernandez requested their transfers—in fact, they state only that they were transferred. In sum, the affidavits of Messrs. Stack and Wall do not show circumstances from which race discrimination could be inferred as required for a *prima facie* case.

In addition, Mr. Acas's deposition testimony establishes that the circumstances

surrounding the reassignments of both Ms. Butler and Mr. Hernandez differ significantly from Mr. Acas's circumstances. Ms. Butler "had a sleep disorder," and Mr. Hernandez "had a heart attack on the facility," and then "he later on had surgery and had a pacemaker installed." (Acas Dep. at 26:25 & 29:4–9.) Ms. Butler and Mr. Hernandez, unlike Mr. Acas, had provided doctor's notes attesting to their medical conditions and stating that, as a medical matter, they could work only the day shift. (*Id.* at 19:19–21, 27:25–29:9–10.) Moreover, when Mr. Acas eventually did obtain a doctor's note, it did not support his request for a shift transfer accommodation. As he explained, the note "doesn't say [that Plaintiff could not work the] third shift, but just did say that . . . because of the situation, my living situation and my diabetes being out of control, that it affected my . . . job performance." (Acas Dep. at 32:22–25.)

There are additional differences between Mr. Acas and both Mr. Butler and Mr. Hernandez, detracting from comparability. The DOC transferred both Ms. Butler and Mr. Hernandez out of the facilities at which they had been working, which form of transfer Mr. Acas did not request.[12] At the time of his transfer Mr. Hernandez worked at the Bridgeport Correctional Center and not at Garner (Acas Dep. at 28:21–22), and thus was under the supervision of different management.[13] There is no evidence that Mr. Hernandez actually

---

[12] According to Mr. Acas, Ms. Butler was "transferred to the Manson Youth Institute" (Acas Dep. at 28:8–9), and Mr. Hernandez "was transferred from . . . Bridgeport Correctional Center to the field services unit, which was outside the facility" (*id.* at 29:12–18). Mr. Acas's testimony establishes that he did not request a transfer out of Garner: he made only oral requests, and he knew that any requests between facilities needed to be in writing. (Pl.'s Answer to Def.'s Interrog. 14 (oral requests only); Acas Dep. at 40:15–41:4 (affirming that "the transfer between facilities has to be in writing").)

[13] While serving as a Lieutenant in 2002 and 2003, Mr. Acas reported to Captains Edwin Myers and Jose Delgado as well as Major J. Foley. (*See* Acas Dep. at 25:25–26:5;

requested a transfer,[14] or that the DOC transferred him because of his medical condition—indeed, Mr. Acas testified that Mr. Hernandez told him he was transferred to lower the likelihood that Mr. Hernandez would "incur an injury from an inmate." (Acas Dep. at 29:12–18.) As to Ms. Butler, the DOC initially denied her any accommodation for her sleep disorder, causing her to bring suit against the DOC for failing to do so. (*Id.* at 27:25–28:9.)

Taken together, these facts put the circumstances of Ms. Butler and Mr. Hernandez at a substantial remove from those of Mr. Acas on the issue of the DOC's accommodation for medical conditions and the scant circumstances shown do not constitute "a reasonably close resemblance of the facts and circumstances" of their and Mr. Acas's situations. Because neither Ms. Butler nor Mr. Hernandez is an appropriate comparator for Mr. Acas, he does not establish circumstances giving rise to an inference of discrimination, and thus fails to make out a *prima facie* case of racial discrimination. Therefore, summary judgment must be granted on Count Two.

### C. Mr. Acas's Motion for Leave to Amend his Complaint

---

*id.* at Ex. 4 at 2–5 (listing Cpt. Myers, Cpt. Delgado and Maj. Foley as Mr. Acas's "immediate supervisor[s]").) Additional uncontradicted evidence indicates that the DOC assigned captains to specific facilities, and that "Captain Myers was a Captain at the Garner Correctional Institution." (Fasano-Fernicola Aff. at ¶ 3). As a consequence, Mr. Hernandez, who was serving at Bridgeport Correctional Center at the time the DOC transferred him, was supervised by supervisors different from those supervising Mr. Acas.

[14] Mr. Acas did not testify that Mr. Hernandez requested a transfer or other reasonable accommodation, or even that prior to his heart attack Mr. Hernandez had been working a shift other than the day shift, to which he was assigned after his heart attack. Mr. Acas stated only that "[Mr. Hernandez] only worked day shift" after his heart attack. (Acas Dep. at 29:10–11.)

On the same day that Mr. Acas filed his motion opposing summary judgment, he also moved for leave to amend his complaint [Doc. # 30] to include allegations that he requested reasonable accommodation on or after August 7, 2003, based on the substance of the affidavits of Messrs. Gibbs, Stack and Wall. For the reasons these affidavits have been excluded because summary judgment has been granted to the DOC on all of Mr. Acas's claims, Mr. Acas's motion is denied as moot.

Alternatively, Mr. Acas's attempt to amend his complaint is substantially and unjustifiably dilatory. In its second Scheduling Order, this Court determined that discovery would conclude on November 16, 2007 and that the DOC's motion for summary judgment would be filed by December 17, 2007. (*See* Scheduling Order dated September 20, 2007 [Doc. # 21].) The time during which Mr. Acas could freely amend his complaint was long past, and under Federal Rule 16(b)(4), Mr. Acas must demonstrate "good cause" for the amendment. Mr. Acas does not demonstrate or even assert good cause for his delay. He does not provide any justification for his failure to plead these facts in his original complaint, and does not explain what, if any, circumstances prevented him from timely amending his complaint. The allegations he now seeks to add to his complaint relate to his personal requests for accommodation that he himself allegedly made which were, or should have been, known to him at the commencement of the action.

In the Second Circuit, district courts "plainly ha[ve] discretion . . . to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defendant." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990). Where, as here, the party seeking to amend his complaint is the dilatory party, "[t]he burden is on the party who wishes to

amend to provide a satisfactory explanation for the delay." *Id.* Because Mr. Acas does not provide any explanation for his delay, he fails to carry his burden in seeking leave to amend his complaint. Moreover, the DOC, having relied on Mr. Acas's original complaint to conduct its discovery and craft its motion for summary judgment, would be prejudiced were this Court to allow Mr. Acas to amend his complaint. Mr. Acas's motion for leave to amend his complaint is therefore denied.

## IV.    Conclusion

For the reasons set forth above, Defendant's motion for summary judgment [Doc. # 22] is GRANTED. Plaintiff's motion for leave to amend his complaint [Doc. # 30] is DENIED. The Clerk is directed to close this case.

IT IS SO ORDERED.

    /s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 29th day of September, 2008.